IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| ESTATE OF EMANUEL DAVID JOSHUA OATES, C/O SHAMAIAH MANRIQUEZ, PERSONAL REPRESENTATIVE, )<br><br>Plaintiff, )<br><br>v. )<br><br>OFFICER FIRST CLASS SANDS and OFFICER FIRST CLASS WAUGH, )<br><br>Defendants. ) | Civil Case No.: GLS-20-2074 |

**MEMORANDUM OPINION**

The Estate of Emanuel David Joshua Oates ("Plaintiff" or "the Estate") has brought a lawsuit against Defendant Officers Sands and Waugh ("Defendants"). Plaintiff claims that Defendants used excessive force against Emanuel Oates ("Mr. Oates"), which resulted in his death. (ECF No. 1).

Pending before this Court is a "Partial Motion to Dismiss and Motion for Summary Judgment," ("Motion") filed by Defendant Officer Sands and Defendant Officer Waugh. (ECF No. 34). The issues have been fully briefed. (ECF Nos. 36, 37). Upon review of the pleadings and the record, the Court finds that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, Defendants' Motion is DENIED.[1]

---

[1] Through their motion, Defendants ask the Court to accept their filing "*nunc pro tunc.*" as it was filed two days after the briefing deadline. (ECF No. 34, p. 2). The proper procedure for seeking leave to file a pleading out of time is set forth in Local Rule 105.9 (D. Md. 2021). Because Plaintiff does not express an opposition to the late filing, (*see* ECF No. 36), the Court will grant the request.

## I.   BACKGROUND

### A.  Procedural Background

On July 16, 2020, Plaintiff filed a six-count Complaint, asserting claims of excessive force, wrongful death, and survival actions, in violation of 42 U.S.C. § 1983 and the Fourth Amendment, and per Md. Code Ann., Estates and Trusts, §7-401.  (ECF No. 1).  The charges stem from an incident that occurred on February 19, 2019,[2] during which Officers Sands and Waugh allegedly violated Mr. Oates' constitutional and civil rights by using unreasonable force against him.  (ECF No. 1, ¶¶ 4, 15).  Defendants filed their Answer on August 21, 2020.  (ECF No. 5).  This case was reassigned to the undersigned on August 30, 2021.

Defendants filed their Motion at the close of discovery. Plaintiff filed its "Response in Opposition to Motion for Summary Judgment," ("Opposition").  In opposing summary judgment, Plaintiff appended an affidavit from the proposed excessive force expert, Captain Joe Perez ("Capt. Perez"), who opined that Defendants' use of force was excessive.  (ECF Nos. 36, 36-3).  In their Reply pleading, Defendants advance a *Daubert* challenge to Capt. Perez's statements, as well as contend that Plaintiff's other arguments lack merit.  Contemporaneous with the Reply pleading, Defendants filed a motion to exclude Capt. Perez' testimony, which is virtually identical to their Reply pleading.  (ECF Nos. 37, 38).  Plaintiff filed a "Response in Opposition to Motion in Limine," to which the Defendants filed a Reply. (ECF Nos. 40, 41).

Construing the video and other evidence in the light most favorable to the Plaintiff does not require this Court to resolve the Defendants' *Daubert* challenge to Capt. Perez's expert

---

[2] In the Opposition, Plaintiff represents that these events occurred on November 3, 2019.  However, this appears to be an error rather than a factual dispute, given that Plaintiff's affidavit from Captain Joe Perez ("Capt. Perez") also notes the date as February 19, 2019.  (ECF No. 36, pp. 3, 5).

testimony. Indeed, as set forth herein, this Court rendered its decision without relying upon Capt. Perez' affidavit.[3]

## B. Factual Background[4]

### 1. Video Footage: A Summary

Officers Torbeck, Sands, Waugh, Askew, and at least four other eyewitnesses saw part or all of Mr. Oates' initial encounter with Officer Torbeck, and later Officer Sands, on the street near the shopping center. Officers Torbeck, Sands, Waugh, Edwards, and several eyewitnesses saw part or all of the shooting of Mr. Oates inside the Aldi, from one or more vantage points.[5]

There are six different videos from body worn cameras, ("BWC"), and one video from the Aldi Supermarket security system. The BWC videos appear to have been recorded by cameras affixed to Officers Torbeck, Sands, Vitacco, Waugh, Edwards, and Askew. The videos capture the following events: (1) the Torbeck video depicts the events from the initial encounter between Officer Torbeck and Mr. Oates, up until Mr. Oates is shot; (2) the Sands video depicts events from

---

[3] At present, the evidence before the Court about Capt. Perez's qualifications and opinions is contained in an affidavit and in a brief Rule 26(a)(2) disclosure. (ECF Nos. 36-3, 40-2). As set forth in a memorandum opinion and order issued on the motion in limine, the Court currently lacks sufficient information from which it can find that Capt. Perez can be qualified as an expert consistent with Fed. R. Evid. 702. Thus, a pre-trial *Daubert* hearing is necessary.

[4] Attached to their summary judgment motion, the Defendants submitted police inventory reports, forensic laboratory reports, incident reports, call detail information, investigative reports, news articles and extracts, witness statements, statements from several police officers, a deposition transcript for Officer Sands, and video footage from Officers Torbeck, Sands, Vitacco, Waugh, Edwards, Askew, and the Aldi Supermarket. (ECF Nos. 34-2- through 34-10). In support of its opposition, Plaintiff submitted an affidavit from Capt. Perez and video footage from Officer Torbeck's body worn camera, one of three body worn camera videos that form the basis for Plaintiff's recitation of facts. (Opposition, p. 3). As stated previously, Defendants also submitted Officer Torbeck's Body Worn Camera, (ECF No. 34-5); however, Defendants' submission of this footage was upside down and more difficult to view. Accordingly, the Court will refer to the version of this footage submitted by Plaintiff. (ECF No. 36-1).

[5] The Court has reviewed all of the evidence, including the body warn camera footage and witness statements. For purposes of this Motion, the Court views the evidence in the light most favorable to the Estate, as the non-moving party. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). Put another way, this court cannot "credit [Defendants'] evidence, weigh the evidence, or resolve factual disputes in. . .[D]efendants' favor." *Knibbs. v. Momphard*, 30 F.4th, 200, 207 (4th Cir. 2022)(citation omitted). In denying summary judgment, this Court is *not* ruling that Plaintiff can necessarily prevail *at trial* without expert testimony regarding whether the uses of force were reasonable. *See* Section III.B.

just after Officer Sands took Mr. Oates to the ground, until Mr. Oates is shot; (3) the Vitacco video depicts events after Mr. Oates was shot; (4) the Waugh video depicts events from a few seconds after Officer Sands took Mr. Oates to the ground, appearing to commence a few seconds after the Sands video commences, up until Mr. Oates is shot; (5) the Edwards video depicts events beginning part-way through the interaction in the Aldi Supermarket, until Mr. Oates is shot; (6) the Askew video depicts events from the interaction between the several officers in the street with Mr. Oates, appearing to commence a few seconds after the Waugh video commences, up until Mr. Oates is shot; and the Aldi video depicts events from when Mr. Oates ran until the Aldi Supermarket until he was shot. In brief, footage captures all or part of Mr. Oates' initial encounter with Officer Torbeck, Mr. Oates being taken to the ground by Officer Sands, Mr. Oates shuffling back and forth in the street, facing several officers, Mr. Oates running down the hill to the shopping center and into the Aldi Supermarket, and Mr. Oates's interaction with the officers inside the Aldi Supermarket.

The Torbeck video is the only video that depicts the initial encounter between Officer Torbeck up until the point that Officer Sands takes Mr. Oates to the ground, and it further depicts only one vantage point of the events taking place in the Aldi Supermarket.  (ECF No. 36-1, "Torbeck BWC").  The Sands video provides: (1) another point of view of the time when Mr. Oates runs away from Officer Sands after they were on the ground, beginning right after Mr. Oates made a stabbing motion toward Officer Sands; (2) what Officer Sands said during the confrontation between Mr. Oates and the officers in the road; and (3) a clearer depiction of events once Officer Sands enters the Aldi Supermarket.  (ECF No. 34-4, "Sands BWC").  The Vitacco video depicts Officer Vitacco driving to the Aldi Supermarket and arriving after Mr. Oates is shot; therefore, the video does not depict the relevant events.  (ECF No. 34-6).  The Waugh video starts

after the Sands video starts, during the confrontation between the officers and Mr. Oates in the street after Mr. Oates runs away from Officers Torbeck and Sands, and after Officer Sands takes Mr. Oates to the ground.  This video provides: (1) what Officer Waugh said in that encounter; and (2) an additional vantage point to view the events in the Aldi Supermarket.  (ECF No. 34-7, "Waugh BWC").

Three individuals witnessed Mr. Oates running down the hill from Old Court Road to the Aldi Supermarket and gave descriptive statements to that effect.  (ECF No. 34-2, pp. 135-137).

The Edwards video depicts events starting in the Aldi Supermarket. Officer Edwards stood to Officer Waugh's left, but his video does not provide any additional details besides identifying Officer Edwards and what he said in the Aldi Supermarket.  (ECF No. 34-8, "Edwards BWC"). Askew video in relevant part shows: (1) Officer Askew driving; (2) Officer Askew pulling up right behind the car that almost hits Mr. Oates during the confrontation on the street; (3) Officer Askew entering the Aldi Supermarket after Officer Waugh, standing near the water bottles, then moving from the entrance to the exit and standing behind the line of carts.  (ECF No. 34-9, "Askew BWC"). The video does not appear to provide additional detail beyond Officer Askew's placement and statements, and the video does not capture the events during the crucial seconds before Mr. Oates was shot.  Finally, the Aldi Video shows a different vantage point of the events in the Aldi Supermarket, from a camera appearing to be affixed high up on the opposite wall of the entrance to the store.  (ECF No. 34-10, "Aldi Video").

Where the parties tell "two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," the Court need not "adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (rejecting plaintiff's version of events in excessive force case when clearly contradicted

by video evidence).  However, the Fourth Circuit has held that the principle articulated in *Scott* "does not hold that courts should reject a plaintiff's account on a summary judgment whenever documentary evidence, such as video, offers some support for a governmental officer's version of events." *Witts v. West Virginia State Police*, 633 F.3d 272, 276 (4th Cir. 2011).  Rather, where video evidence whose authenticity is unquestioned does not "clearly support" the moving party's account, the video must be viewed in the light most favorable to the nonmoving party. *Tserkis v. Baltimore County*, Civ. No. ELH-19-202, 2021 WL 3129325, at *3 (D. Md. July 23, 2021) (citing *Brooks v. Johnson*, 924 F.3d 104, 108, 115 (4th Cir. 2019)).  Put another way, where the video "does not 'clearly' or 'blatantly' contradict" Plaintiff's version of the facts, the Court adopts Plaintiff's version. *Hupp v. Cook*, 931 F.3d 307, 315 (4th Cir. 2019) n.3 (quoting *Witt*, 633 F.3d at 276–77).

### 2. Interaction between Officer Sands and Mr. Oates ("Torbeck BWC")

On February 19, 2019, Officer Torbeck interacted with Ms. Dorsey, the Dollar Tree manager.  Ms. Dorsey approached Officer Torbeck and told her that her employee believed that Mr. Oates had stolen some items from the store.  (ECF No. 34-2, pp. 117-118).  Officer Torbeck attempted to talk to Mr. Oates, who walked away toward Old Court Road, a four-lane road that runs southwest to northeast next to a shopping center, including the Aldi Supermarket at 8608-A Liberty Road, Randallstown, Maryland, 21133.[6] Officer Torbeck followed Mr. Oates, and her video starts around 4:07 p.m., as Officer Torbeck stands on the west, shopping-center-side of the road, and Mr. Oates stands in the center of the road, waiting to cross the remaining two lanes. (Torbeck BWC, 0:00-0:10). Mr. Oates walks at a slow pace, occasionally looking back at Officer Torbeck, who follows closely behind.  (*Id.*).  Mr. Oates is wearing a backpack and holding a grey

---

[6] This fact is not in dispute.

plastic grocery bag in his right hand that appears to contain some items. (*Id.*, 0:10). The video has no sound at this point, but it appears that Mr. Oates speaks to Officer Torbeck as he walks slowly along the sidewalk across the street from the Aldi Supermarket, heading southwest. (*Id.*, 0:13). Officer Torbeck was attempting to question Mr. Oates about an allegation that he shoplifted from the nearby Dollar Tree.[7] (ECF No. 34-2, pp. 71, 85, 89). Mr. Oates steps back into the rightmost lane of the street and continues slowly walking. (Torbeck BWC, 0:15). Mr. Oates takes four or five steps, and holds his right hand out, waving it from left to right and back as he walks. (*Id.*, 0:16-0:20). Officer Torbeck follows Mr. Oates from a few feet away on the sidewalk. (*Id.*, 0:20-0:25). From what appears to be a few yards down the sidewalk, at least three people are on the sidewalk in this area and appear to be waiting for a bus. (*Id.*).

At the thirty second mark of the Torbeck video, the audio activates, and the Mr. Oates can be heard saying, "Get away from me!" (*Id.*, 0:30-0:31). Officer Torbeck responds, "I'm not done talking to you," (*Id.*, 0:32). Mr. Oates pulls out a receipt, holding it straight from either end, then holds it out to Officer Torbeck in his right hand while holding the plastic bag in his left hand. (*Id.*, 0:32-0:35). Mr. Oates states, "I have a receipt for everything I got." (*Id.*). Officer Torbeck replies, "That's okay. That's all we have to do. I just want to confirm, I just want to confirm." (*Id.*). Mr. Oates adds, "I have a receipt. You have no right." (*Id.*, 0:38-0:39). Mr. Oates repeats, "I have my receipt, you don't have no right to." (*Id.*, 0:42-0:43). Officer Torbeck replies, "Yes, I do. Someone called me asking for help; that's what I'm doing." (*Id.*, 0:40-0:43). Mr. Oates adds, "You don't have no right to," as Officer Torbeck says, "Yes I do, let me see." (*Id.*, 0:46-47). At this point Mr. Oates stops and turns to Officer Torbeck, stating, "I bought all my stuff." (*Id.*, 0:47-0:48). He takes a step toward Officer Torbeck, opening his plastic bag with both hands and holding it an inch

---

[7] This fact is undisputed, although the footage from Officer Torbeck's Body Worn Camera does not contain audio until the 30-second mark.

or two away from his body toward Officer Torbeck. (*Id.*). He adds, "I bought everything I purchased." (*Id.*). Mr. Oates repeats, "You can't stop me," and Officer Torbeck replies, "I have the right to stop you." (*Id.*, 0:50-0:51).

Mr. Oates takes five slow steps down the sidewalk, with Officer Torbeck a few feet behind. (*Id.*, 0:52-56). He stops, turns around, and re-engages in conversation, putting his right hand over his heart and saying, "Everything I've got on me, I got my own food and I bought it myself." (*Id.*, 0:57). Officer Torbeck responded, "Okay, well she told me…" and the rest of her sentence is unintelligible. (*Id.*, 1:01). Oates appears to look to Officer Torbeck's right side, where a third person appears to be standing, though the video does not show this person in frame until Torbeck BWC 1:03-1:06, where the arm of a third person, wearing a teal sweater, comes into view on Officer Torbeck's right. (*Id.*, 1:01-1:06). It is not clear from the video at what point Officer Torbeck called for assistance.[8] However, at this point, the video shows an additional police car with Officer Sands inside driving up in the right lane next to the sidewalk. (*Id.*, 0:57-1:04; ECF No. 34-3 "Sands Deposition," pp. 11-12).[9] As the police car drives up, multiple voices speak at once, making the audio difficult to understand. It sounds like Officer Torbeck said, "Okay, all right," and a third voice says, "yes you are you are going to give me…" and the rest of the person's sentence is not clear. (*Id.*, 1:03-1:09). Mr. Oates takes four steps away from Officer Torbeck, turns back and says, "No, you're not," and takes four more steps as Officer Torbeck follows closely behind. (*Id.*, 1:06-1:10).

---

[8] In the Askew video, while Officer Askew is driving, a voice on the police radio appearing to be Officer Torbeck can be heard saying "I'm now on Old Court Road." (Askew, 0:55-0:56). Another voice says something unintelligible, then "male with a white sweatshirt," and Officer Torbeck says, "I'm following him, he's not complying." (*Id.*, 0:57-1:08). A minute later, the voice on the police radio says, "He has a knife!" (*Id.*, 2:16-2:18).

[9] This fact is not in dispute.

At this point, Mr. Oates was even with the back of Officer Sands' police car, and he looks to his right, where the video depicts Officer Sands exiting the driver's side of the car and walking quickly around the back of the car toward Mr. Oates. (*Id.*, 1:10-1:11). Mr. Oates states, "You can't touch me." (*Id.*, 1:11). A woman was standing on the sidewalk to Mr. Oates' left, about two or three feet away, and a man was standing on the sidewalk ahead and to the left of Mr. Oates, about five or six feet away. (*Id.*). Mr. Oates continues straight and to the right, stepping into the street off the sidewalk and "gearing up" to run or engage in some evasive maneuver by lifting his right foot, pulling his right elbow back, and pushing his left arm forward. (*Id.*, 1:12). Mr. Oates is not headed in the direction of any of the bystanders. (*Id.*). Before Mr. Oates could run anywhere, and without saying anything, Officer Sands grabs Mr. Oates with both hands. (*Id.*). At this point, Officer Sands is right behind Mr. Oates' back and appears to grab either his shoulders or the strap of his backpack, though the video does not clearly depict which. (*Id.*). Mr. Oates is taken to the ground, face first. (*Id.*). As he goes down, his left hand touches the ground such that he turns and lands on his left side. (*Id.*). It is not clear from the video how much force Officer Sands used to take Mr. Oates to the ground. (*Id.*).

Immediately after Mr. Oates is brought to the ground, Officer Sands was above him, and appears to have his knee in or on top of Mr. Oates' stomach. (*Id.*, 1:12). Mr. Oates is lying down on the pavement, slightly turned onto his left side. (*Id.*). Officer Sands then lands on top of Mr. Oates. (*Id.*). It is not clear from the video whether Officer Sands fell or jumped onto Mr. Oates. (*Id.*). Officer Sands' right hand appears to rest on either Mr. Oates' neck or shoulder, but the video does not make clear which. (*Id.*, 1:13). The frame of the video shifts, as Officer Torbeck appears to move closer to Mr. Oates and Officer Sands, and only Officer Sands and a part of Mr. Oates' hand and head are visible. (*Id.*). The video next shows Officer Sands and what appears to be Mr.

Oates' left hand holding a long knife, which had been sheathed in a holster.  (*Id.*, 1:14).  The video does not clearly depict the exact moment when Mr. Oates pulled out the knife, but it happens after Officer Sands took Mr. Oates to the ground.  (*Id.*).  Officer Sands moves to a kneeling position next to Mr. Oates, who was laying down on his side on top of his backpack.  (*Id.*).  Mr. Oates' plastic grocery bag can be seen in the background, apparently having been dropped in the scuffle. (*Id.*).  A hand, which appears to be Officer Torbeck's, appears in frame holding Mr. Oates' left side.  (*Id.*).  Officer Sands took a step backward from Oates and crouched over Mr. Oates, while Mr. Oates began to partially sit up.  (*Id.*).  Mr. Oates moves the knife form his left hand to his right and appears to move the knife in the direction of Officer Sands' left hip.  (*Id.*, 1:15).  The frame of the video shifts, and Officer Sands is not in the frame, so the video only depicts part of Mr. Oates holding the knife out.  (*Id.*).  The video does not depict the knife ever making contact with Officer Sands, just that Mr. Oates moved the knife in Officer Sands' direction.  (*Id.*).  The audio captures a "thud" sound, and Officer Torbeck screams, "Oh!"  (*Id.*).  Mr. Oates does not say anything. (*Id.*).

Mr. Oates holds the handle of the knife in his right hand and the blade of the knife with his left hand as Officer Sands takes a step backwards and Officer Torbeck grabs the back of Mr. Oates' sweatshirt with both hands.  (*Id.*, 1:16).  The video does not clearly show whether Mr. Oates sits up or Officer Torbeck pulls him up.  (*Id.*, 1:17).  Officer Sands continues to back away.  (*Id.*).  Mr. Oates turns to his left, facing down, to push himself up from the ground, and he begins to stand up at the same time that Officer Torbeck takes a step back.  (*Id.*).  At this point, Mr. Oates is holding his backpack on only his right shoulder, and the strap appears to be slipping down his right arm. (*Id.*). His right arm is up, with the knife in his right hand.  (*Id.*).  Then, Officer Torbeck turns away from Mr. Oates such that he is no longer in frame of the video, and she moves away from where

he was standing. (*Id.*). Officer Torbeck runs a few steps, back up the sidewalk and stands behind a bystander who is located near the bench. (*Id.*, 1:18). The frame of Torbeck's video shows only the bystander directly in front of Officer Torbeck, then beyond him is Officer Sands in the road, running and pointing his gun in the direction where Mr. Oates ran, and what appears to be a third officer in the road to Officer Sands' left. (*Id.*, 1:18-1:19). Officer Torbeck yells, "He has a knife! He has a knife!" (*Id.*). The video next shows that Officer Torbeck turns, and Mr. Oates comes into frame in the center of the road, running northeast on the left side of Officer Sands' police car, while Officer Torbeck pursues him from the right side of the police car. (*Id.*, 1:19-1:20). Two bystanders, the woman in the teal sweater and another bystander, run to get out of the way as Mr. Oates runs northeast in the road and the officers pursue with guns drawn. (*Id.*, 1:20-1:21). Mr. Oates does not pursue the bystanders, but instead turns, standing in the middle of the road, facing the three officers, all with guns drawn. (*Id.* 1:21-1:23). Officer Sands' video depicts from his vantage point that when Mr. Oates started to stand up, Officer Torbeck ran away from Mr. Oates to a spot behind a bench located on the right side of Sands' police vehicle. Mr. Oates does not pursue her, but instead ran to the left of the police vehicle. (Sands BWC, 0:01-0:04).

Officer Waugh arrived on the scene as Officer Sands and Mr. Oates went to the ground. (ECF No. 34-2, p. 106). Officer Waugh observed Officer Sands "kick [Mr. Oates], as [Mr. Oates] appeared to have a machete." (ECF No. 34-2, p. 106). Officer Waugh had no knowledge of any stabbing or stabbing motion by Mr. Oates. (ECF No. 34-2, p. 107). Officer Waugh's video begins after Oates has run away from Officer Sands, appearing to place Officer Waugh in the center turning lane of the road, running northeast after Mr. Oates. (Waugh BWC, 0:00-0:07). He yells, "Drop it!" (*Id.*, 0:02).

Mr. Oates continues to move in a northeasterly direction, shuffling sideways away from the officers, weaving between the street and the sidewalk and alternating between facing the officers and turning his left side toward the officers, who are standing in a semi-circle formation on the road and the sidewalk.  (Torbeck BWC., 1:30-1:40).  At no point does the video footage depict Mr. Oates saying anything or waving his knife at any person.  A police car drives up into the rightmost lane where Mr. Oates was standing, and Mr. Oates quickly jumped onto the sidewalk to avoid being hit by the car.[10]  (*Id.*, 1:40-1:41).  As that police car drives near Mr. Oates, Officer Waugh says, "Drop the knife!" (Waugh BWC., 0:09).  Waugh yells again, "Drop the f****ng knife!"  (*Id.*, 0:12-0:13).  Officer Torbeck yells, "drop the knife!" three times.  (Torbeck BWC., 1:20-1:29).  Mr. Oates shuffles left to right in the road, and then moves along the sidewalk away from the officers.  (*Id.* 1:23-1:30).  Officer Torbeck yells again, "drop the knife!"  (*Id.*, 1:32-1:33).  Officer Sands twice yells, "Drop the f****ng knife!" (Sands BWC, 0:18-26).  Mr. Oates walks back into the street and throws an unknown object.[11]  (*Id.*, 1:42-1:44).  Officer Torbeck repeats, "Drop it!" then adds "he's throwing things at us."  (*Id.*, 1:42-1:49).

Mr. Oates runs away from the officers, across the street and runs some distance down the hill toward the shopping center.  Officer Sands tells the other officers, "Don't approach him," as they begin to follow Mr. Oates down the hill.  (*Id.*, 1:49-2:00; Sands BWC 0:42).  The officers run after Mr. Oates down the hill, past other businesses and into the Aldi Supermarket.  (Torbeck BWC, 2:25).

---

[10] None of the video footage identifies the officer who drove the car that almost hit Mr. Oates. Officer Askew arrived on the scene at about this point by car, pulling in right behind the car that almost hits Mr. Oates.  (Askew BWC, 2:40-2:42).

[11] The parties both state that the object was a can.

12

There are several statements from witnesses who described Mr. Oates as "running away" from the officers. (ECF No. 34-2, pp. 135-137). In addition, one witness described the following:

> On 2/19/2019 A child was being chased by officers from a bus stop on Old Court. The child ran down pass (sic) Hibachi grill into Aldis (sic). I pulled up to see in the store the next thing I hear 3-4 shorts and the child was running away not trying to attach no one he had a black object a knife with a cover on it.

(ECF No. 34-2, p. 123).

### 3. Officer Sands' Video: Aldi Supermarket

When Officer Sands entered the store, two officers were already present, Waugh, and Edwards. (Sands BWC, 1:12). Officer Torbeck entered on Officer Sands' left side. (*Id.*). Customers stand near the registers. Officer Sands yells, "get the f**k out of the store!" and customers and employees either leave or crouch behind the registers. (*Id*, 1:13-1:14). No customers are visible after this. Mr. Oates stands in the store back by the freezer section, appearing to be several yards from Officer Sands, though the video does not clearly depict the distance. (*Id.*, 1:15). He takes three steps forward, holding his knife in his right hand, pointed down at the ground. He holds his left palm out. (*Id.*, 1:15-1:17). Mr. Oates then takes four steps backwards. (*Id.*, 1:19-1:23). Officer Sands yells, "You already tried to stab me, drop the knife." (*Id.*, 1:19-1:20). Mr. Oates places his left arm in front of his body, elbow bent at a ninety-degree angle, and he holds the knife up in front of his left arm; possibly looking like the sign of a cross. Mr. Oates then takes a step backward and lowers the knife again. (*Id.*, 1:24). Officer Sands repeats, "Drop the knife." (*Id.*). The video appears to depict Mr. Oates touching his mouth with his left hand, looking at the ceiling, and raising his left hand to the sky, as if in prayer. (*Id.*, 1:26). He takes four small steps and makes a sweeping gesture with his left hand as Officer Sands repeats, "Drop the knife, you already tried to stab me." (*Id.*, 1:26-1:32).

Mr. Oates holds his left hand raised in a "stop" gesture and his right hand by his hip pointed down, and he states, "No weapon formed against me shall prosper." (*Id.* 1:33). Officer Sands turns briefly, so Mr. Oates is briefly out of frame. (*Id.*, 1:34). When Officer Sands turns back moments later, Mr. Oates takes three steps forward while saying, "No weapon formed against me, Satan, I rebuke you." (*Id.*, 1:34-1:39). While he says this, Officer Waugh moves around an aisle to back away from Mr. Oates. (*Id.*, 1:38-1:40). Officer Edwards told Mr. Oates to drop the knife twice. (Edwards BWC, 0:32, 0:36). Mr. Oates continues to take three more slow steps in the direction of Officers Waugh and Edwards and Officer Sands yells, "Drop the knife, I'm gonna shoot!" (Sands BWC, 1:39-1:40). Officer Torbeck crosses in front of Officer Sands from his left to his right. (*Id.*). Officers Waugh, Torbeck, Edwards, and Sands are standing in a semi-circle in the corner by the automatic door entrance to the Aldi. Mr. Oates continues taking two more big but slow steps, and Officer Sands yells one more time, "Drop the knife!" (*Id*, 1:41). Mr. Oates appeared to be speaking, but Officer Sands' video does not capture his words clearly. The video does not clearly depict the distance between Mr. Oates and Officer Sands. Mr. Oates appeared to be closest to Officer Waugh, but the video also does not clearly depict the distance. Though the video does not clearly show gunfire, multiple sounds appearing to be gunshots can be heard. (*Id.*, 1:41-1:42). Upon being shot, Mr. Oates immediately dropped to the ground. (*Id.*, 1:43). The officers other than Officer Sands approach Mr. Oates and appear to begin to render first aid. (*Id.*, 1:52). Mr. Oates subsequently passed away from his injuries after being transferred to Northwest Hospital for treatment. (ECF No. 34-2, pp. 70-71).[12]

---

[12] This fact is not in dispute.

### 4. Officer Waugh Video: Aldi Supermarket

Officer Waugh appears to be the first officer inside the Aldi.  (Waugh BWC, 0:50).  Officer Waugh follows Mr. Oates into the store, toward the freezer, where Mr. Oates stopped running and turned to face Officer Waugh.  (*Id.*, 0:50-0:55).  During much of the video, Mr. Oates is partially out of frame or partially obscured by Officer Waugh's hand and gun. Officer Waugh yells, "Drop the f****ng knife!" and "Drop it!" while aiming his gun at Mr. Oates, who is walking slowly from the freezer section with his left hand outstretched, palm facing out.  (*Id.*, 0:55-0:57).  Mr. Oates takes two steps forward, and Officer Waugh backs up to the second aisle, yelling, "Back up, everybody back up!"  (*Id.*, 0:59-1:00).  The customers move out of frame, appearing to walk in the direction of the registers and/or towards the store's exit.  (*Id.*, 1:01).  Mr. Oates speaks, and his words are not decipherable from the audio on Officer Waugh's video.  (*Id.*, 1:00-1:13).  Mr. Oates takes two steps forward, stops, and takes a step back, possibly making the sign of a cross while Officer Waugh yells, "Drop the knife, drop the f****ng knife!"  (*Id.*, 1:01-1:08).  Mr. Oates makes the gesture where he appears to touch his left hand to his mouth and then raise it to the sky as Officer Waugh says more quietly, "Back up, back up. Drop the knife, bro."  (*Id.*, 1:10-1:11).  Mr. Oates then takes four slow steps over the span of six seconds toward Officer Waugh, with the knife still pointed down at the ground.  (*Id.*, 1:11-1:17).  Officer Waugh says, "watch your crossfire." (*Id.*, 1:15).  Mr. Oates is almost entirely obscured from the video for two seconds, but Mr. Oates can be heard saying, "No weapon formed against me shall prosper."  (*Id.*, 1:18-1:19).  The video depicts Officer Waugh's hand moving, revealing Mr. Oates taking one step to his right and then standing still, saying, "No weapon formed against me, Satan."  (*Id.*, 1:20-1:21).  Officer Edwards told Mr. Oates to drop the knife twice.  (Edwards BWC, 0:32, 0:36).  Mr. Oates raises his left hand, palm outstretched toward Officer Waugh and takes five steps toward Officer Waugh, saying, "I

rebuke you," while Officer Waugh stepped to the left and backward to move around an aisle. (Waugh BWC, 1:22-1:26).  Mr. Oates says, "In the name of Yeshua . . ." and the rest of his words cannot be clearly understood due to the officers yelling.  (*Id.*, 1:25-1:26).  From Officer Waugh's vantage point, Mr. Oates appears to have his left hand out in front of his face, palm out, and his right hand holding the knife, pointed down and backward behind his body.  (*Id.*, 1:26).  Officer Waugh holds his gun with both hands, and the video appears to depict his hands move with the recoil as the he fires, and gunshots can be heard.  (*Id.*).  Mr. Oates is not fully visible in the frame, but he can be seen falling to the ground, his knife skidding several feet behind him.  (*Id.*, 1:27). Officer Waugh pauses for a few seconds, and screams can be heard in the store, then he walks forward to Mr. Oates, who is motionless on the ground and yells, "Yo, where's the knife at, where's the knife?"  (*Id.* 1:29-1:36).

        *5. Aldi Supermarket Video*

        Upon review of the Aldi Supermarket video, it is not clear to the Court how fast the events depicted in the video transpired.  The video has no audio.  There is also some visual distortion of the video, like a "fisheye" lens effect, which appears to be present so that the frame can fully capture the front half of the store. Finally, the video quality is choppy, as if few frames per second are being captured.

        At the moment when Mr. Oates enters the store, nineteen customers and workers are visible.  (Aldi Video, 3:11).  Mr. Oates runs into the store, and then begins walking toward the freezer section.  (*Id.*, 3:11-3:18).  He turns back and appears to be looking in the direction of the first officer to enter the store and follow him, as the second officer enters.  (*Id.*, 3:18).  He takes two steps toward the officer, as two more officers enter.  (*Id.*, 3:19-3:20).

By the time that all five officers are in the Aldi Supermarket and Mr. Oates is beginning to walk toward them, all of the remaining customers in frame are crouched down in the register area. (*Id.*, 3:25). Mr. Oates does not walk near the hiding customers. Instead, he walks toward the Officers, raising his left hand out and holding his right hand, which appears to hold a knife, at his side, then behind him, pointed at the ground. (*Id.*, 3:25-3:27). Mr. Oates stops, takes four steps backward, then moves his arms in front of his body, possibly in the sign of a cross, then moves his hands down and out. (*Id.*, 3:28-3:33). He raises his left hand to the sky. (*Id.*, 3:33-3:36). His left hand drops and he takes five steps forward, holding his right hand at his side and holding his left hand up. (*Id.*, 3:36-3:42). He takes a step or two forward and to his right, stopping. (*Id.*, 3:42-3:45). He takes two steps forward toward an officer with his left and raised, and his right shoulder back such that his knife is not only down, but also slightly behind him, and the officer moves to the officer's left and backward to navigate around an aisle. (*Id.*, 3:45-3:47). Mr. Oates takes five more steps toward the officers and appears to briefly pause before he bends forward and falls to the ground backward. (*Id.*, 3:47-3:51).

## II.   STANDARDS OF REVIEW

### A.  Motion to Dismiss

A defendant who files a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) asserts that, even if a court construes the facts advanced in the Plaintiff's complaint as true, that complaint fails to state a claim upon which relief can be granted. To survive a motion to dismiss, then, a complaint must contain sufficient facts, and must state a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also* Fed. R. Civ. P. 8(a); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (complaint must set forth enough facts as to suggest a "cognizable cause of action"). A claim has facial plausibility when the plaintiff pleads factual content that "allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint must only satisfy the standard of Fed. R. Civ. P. 8(a), namely, it must have a "short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice" of the claim. *Twombly*, 550 U.S. at 555.

### B. Motion for Summary Judgment

Motions for summary judgment shall be granted only if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987) (internal citation omitted). The burden can be satisfied through the submission of, e.g., pleadings, depositions, answers to interrogatories, admissions, and affidavits. *Celotex Corp.*, 477 U.S. at 323; *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). To defeat a motion for summary judgment, on the other hand, the nonmoving party cannot simply cast "metaphysical doubt" on the material facts, but rather must provide specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing Fed. R. Civ. P. 56(e)). The relevant inquiry is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Black v. Webster*, Civ. No. 20-3644, 2022 WL 169669, at *4 (D. Md. Jan. 18, 2022) (citing *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014)).

The Court must construe the facts and documentary materials submitted by the parties, including the credibility and weight of particular evidence, in the light most favorable to the party

opposing the motions. *Masson v. N.Y. Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson*, 477 U.S. at 255). A mere scintilla of evidence is insufficient to create an issue of material fact. *See Barwick*, 736 F.2d at 958–59 (citing *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C 1966)). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

### A.  Defendants' Partial Motion to Dismiss: 42 U.S.C. § 1983

Defendants contend that Plaintiff's Complaint alleges a violation of 42 U.S.C. § 1983 standing alone, i.e., without being linked to a violation of a specific statutory or constitutional right. According to the Defendants, then, the Complaint should be partially dismissed. (ECF No. 34-1, pp. 10-11). Plaintiff counters that Counts I and IV (excessive force) clearly articulate violations of the Fourth Amendment of the United States Constitution tied to the Section 1983 allegations. (ECF No. 36, p. 20).

The Supreme Court has held that Section 1983 "provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002) (citing *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)). In this case, Plaintiff plausibly pleads two Counts of excessive force committed in violation of the Fourth Amendment that rely upon sufficient facts articulated in the Complaint. (*See, e.g.,* ECF No. 1, ¶¶ 16-19, 44-48). Accordingly, this Court finds Defendants' argument unavailing, and will deny the Motion as to this issue.

### B.  Defendants' Motion for Summary Judgment

The Defendants contend that they are entitled to summary judgment on all of Plaintiff's claims because there are no genuine disputes of material fact that: (1) Officer Sands used

reasonable force when he initially stopped Mr. Oates; (2) Officer Sands reasonably used lethal force in the Aldi Supermarket; and (3) Officer Waugh reasonably used lethal force in the Aldi Supermarket.

### 1. Excessive Force

The Fourth Amendment protects ordinary citizens from "unreasonable seizures" by prohibiting law enforcement from using excessive force in connection with investigatory stops, arrests, or other "seizures [of] free citizens." *Graham v. Connor*, 490 U.S. 386, 395-96 (1989); *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019). A police officer's use of force against an individual constitutes an unreasonable seizure violative of that individual's Fourth Amendment rights if the officer's actions are not "objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal citation omitted).

To evaluate the reasonableness of an officer's use of force, a court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. In *Graham*, the Supreme Court identified three non-exhaustive factors to assess the reasonableness of an application of force:

> (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether [the suspect] was actively resisting arrest or attempting to flee.

*Id.* at 396. When a court evaluates the reasonableness of a particular use of force, it must do so "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Regarding the first factor, the Fourth Circuit has recently held that where the circumstances leading to the challenged use of force are unrelated to or removed in time from the initial minor criminal violation the officer was investigating, the first *Graham* factor does not carry

20

much weight in the reasonableness analysis. *Knibbs v. Momphard*, 30 F.4th 200, 215 (4th Cir. 2022) (finding the first *Graham* factor was "not particularly germane" where the officer first investigated a misdemeanor property crime but used force after suspect "racked" his shotgun). At the same time, the Fourth Circuit has also held that where the initial violation was minor but the interaction between the officer and the plaintiff escalated, a court may consider the initial minor violation as weighing against the use of force. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) ("When all the factors are considered *in toto*, it is impossible to escape the conclusion that a man suffered a serious leg injury over a lost five-dollar bill.").

In reviewing uses of force, a court should not create "artificial divisions in the sequence of events." *Smith*, 781 F.3d at 101 (rejecting officer's argument that each step in a physical fight was reasonable in light of the plaintiff's immediately preceding actions); *see Rowland*, 41 F.3d at 173 (same).

The Court will therefore examine all of the actions of the officers, and "determine whether there is a genuine dispute of material fact regarding the objective reasonableness of each instance of force." *Black*, 2022 WL 169669, at *4.

        a. <u>Use of Force during *Terry* Stop</u>

A detention for investigative purposes is reasonable if an officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," and that the suspect may be "armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The Fourth Circuit has acknowledged that although *Terry* stops should be minimally intrusive, officers may use "such reasonable force as may be necessary" to seize a suspect. *Maney v. Garrison*, 681 F. App'x 210, 220 (4th Cir. 2017) (quoting *United States v. Haye*, 825 F.2d 32, 35 (4th Cir. 1987)).

The Fourth Circuit has further held that an officer who tackles a nonthreatening misdemeanor suspect engaging in passive resistance uses excessive force. *Livingston v. Kehagias*, 803 F. App'x 673, 685 (4th Cir. 2020). *Compare Smith v. Ray*, 781 F.3d 95, 105 (4th Cir. 2015) (clearly established constitutional violation, where officer threw suspect down on the ground for misdemeanor violation, even where suspect pulled her arm away from him and took a step back); *and Rowland v. Perry*, 41 F.3d 167, 172-74 (4th Cir. 1994) (clearly established constitutional violation, where suspect committed minor crime and there was some evidence of resistance, but officer used "wrestling maneuver" to take suspect down); *with United States v. Haye*, 825 F.2d 32, 34 (4th Cir. 1987) (officer was justified in tackling suspect who, instead of declining to answer questions and walk away, took flight upon seeing police).

b. <u>Lethal Force</u>

An officer may use lethal force only when he or she has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (internal citations omitted)). The Fourth Circuit has held that "mere possession" of a weapon does not confer "unfettered authority to shoot," because a person enjoys the right to be free from deadly force when they are posing no threat. *Betton*, 942 F.3d at 191 (quoting *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013)). Specifically, the Fourth Circuit has held that an officer who uses lethal force against an individual does so in violation of the individual's Fourth Amendment right against unreasonable seizures, where the individual:

> (1) was suspected of having committed a burglary and a battery;
> (2) was standing about 20 feet from the officer holding a knife, inflicting harm on himself and stumbling, but not threatening others or making sudden movements; and
> (3) was refusing to obey the officer's repeated commands to drop the knife at the time he was shot.

*Wilson v. Prince George's County*, 893 F.3d 213, 222, 224 (4th Cir. 2018); *see also Connor v. Thompson*, 647 F. App'x 231, 239 (4th Cir. 2016) (officer unreasonably used lethal force where plaintiff with mental health impairments refused to drop a knife held in a non-threatening manner while slowly staggering downstairs).

In this case, there are three uses of force: (1) Officer Sands' use of force on Mr. Oates upon his initial contact with him; (2) Officer Sands' use of lethal force in the Aldi Supermarket; and (3) Officer Waugh's use of lethal force in the Aldi Supermarket.

### c. Initial Interaction Involving Officer Sands and Mr. Oates

In this case, Plaintiff never alleges in its Complaint that Officer Sands acted without reasonable articulable suspicion or probable cause when he took Mr. Oates to the ground.  (*See* Complaint).  Instead, Plaintiff alleges that Officer Sands "knowingly used greater force than was objectively reasonable and necessary under the circumstances in effectuating what would have been an arrest for a minor misdemeanor charge[.]"  (*Id.*, ¶ 46).  Accordingly, following the *Graham* factors, the Court analyzes whether Officer Sands used reasonable force in seizing Mr. Oates and taking him to the ground.

Construing the BWC evidence in the light most favorable to the Estate, the Court finds that a genuine dispute of material fact exists regarding whether Defendant Sands used greater force than necessary, i.e., acted objectively unreasonably when he took Mr. Oates to the ground. Plaintiff asserts that as Mr. Oates walked away from Officer Torbeck, Officer Sands threw him to the ground. Defendants dispute Plaintiff's version of events and contend that: (1) Officer Sands merely grabbed Mr. Oates' jacket and backpack strap and knocked him off-balance when Mr. Oates pulled away; and (2) that Officer Sands chased Mr. Oates a short distance behind his patrol vehicle before grabbing him.  This Court may not make "credibility determinations" in ruling on

23

a motion for summary judgment.  *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 666 (4th Cir. 2018) (citing *Anderson*, 477 U.S. at 255).

Turning to the first factor articulated in *Graham*, the severity of the crime at issue, at the time that Defendant Sands threw Mr. Oates to the ground, it is undisputed that the suspected crime was at most a misdemeanor charge for shoplifting at the Dollar Tree.  A nonviolent misdemeanor offense, by itself, does not give an officer a reason to believe that a suspect is a "potentially dangerous individual;" thus, the presence of this fact by itself weighs against the use of force. *Smith*, 781 F.3d at 102 (citing *Young v. County of Los Angeles*, 655 F.2d 1156, 1165 n.8 (9th Cir. 2011).  In addition, a reasonable jury could conclude that Mr. Oates showed Officer Torbeck the receipt multiple times as they walked down the sidewalk, as well as showed his bag of items to the officer.  (Torbeck BWC, 0:32-0:34, 0:47-0:48).  Under these circumstances, a jury could reasonably conclude that Mr. Oates was no longer truly a suspect and there was no basis to continue to attempt to detain him.

As for the second factor, whether the suspect poses an immediate threat to the safety of officers or others, the video footage provides some support for Plaintiff's narrative that no evidence existed that Mr. Oates posed a threat to Officer Torbeck, Officer Sands, or any of the surrounding bystanders at the time when Officer Sands took Mr. Oates to the ground.  In the Torbeck video, Mr. Oates did not approach any bystanders or officers, and he did not appear to pull out his knife until after Officer Sands took him to the ground.  (Torbeck BWC, 1:13).  Therefore, if a jury finds that the video footage provides support for the argument that there are no facts to support that the officers had probable cause to arrest Mr. Oates, then this  also suggests that the use of force was unreasonable.  *Smith*, 781 F.3d at 102.

Finally, with regard to the third factor, whether the suspect was resisting arrest or attempting to evade arrest, the video footage depicts Mr. Oates walking away from Officer Torbeck, stopping, re-engaging, and then continuing ahead, away from Officer Torbeck. (Torbeck BWC, 1:05-1:10). Mr. Oates appeared to attempt to engage in some evasive maneuver by lifting his right foot, pulling his right elbow back, and pushing his left arm forward. (*Id.*, 1:12). However, it is not clear from the video footage that Mr. Oates was fleeing from the police. If the video footage supports Plaintiff's version that Mr. Oates was not fleeing, but passively resisting, then Officer Sands' use of force would be unreasonable as a matter of law. *Livingston*, 803 F. App'x at 685; *Smith*, 781 F.3d at 105; *Rowland* 41 F.3d at 172-74.

Moreover, the video footage does not conclusively settle the dispute of fact as to how much force Officer Sands used to take Mr. Oates to the ground and whether that force was reasonable under the circumstances. (Torbeck BWC, 1:10-1:14). *See Black*, 2022 WL 169669, at *8 (video evidence did not settle dispute of fact as to whether officer used unreasonable force by placing unnecessary weight on plaintiff).

Defendants further aver that even if Officer Sands' use of force in tackling Mr. Oates was unlawful, when Mr. Oates made a stabbing motion toward Officer Sands, he committed a new crime authorizing Officer Sands to arrest Mr. Oates and purging the taint of any prior improper action. *See United States v. Sprinkle*, 106 F.3d 613, 619-20 (4th Cir. 1997). However, the Fourth Circuit's holding in *Sprinkle* concerned the application of the exclusionary rule in a criminal proceeding. *Id.* The Fourth Circuit has further clarified that the holding in *Sprinkle* was animated by the policy that a criminal defendant should face the consequences of intervening criminal action, even where an initial stop was illegal. *United States v. Terry*, 909 F.3d 716, 723 (4th Cir. 2018). Neither the Fourth Circuit nor any court in this District has extended *Sprinkle* into the

Section 1983 context to hold that an unlawful stop is not an actionable violation of the Fourth Amendment due to a subsequent intervening criminal event.  This Court declines to do so here. *See, e.g.*, *Sherrill v. Cunningham*, Civ. No. JKB-18-476, 2018 WL 3533550, at *12 (D. Md. July 23, 2018) (plaintiff alleged constitutional violation under Section 1983 with regard to officer's initial stop, where officer stopped the plaintiff unlawfully, the plaintiff committed an intervening crime, then the officer arrested the plaintiff).

On a related note, if such evidence were before it at trial, a jury could find that Officer Sands should have pursued a different alternative to the force that he used. For instance, if after a *Daubert* hearing the Court finds that Captain Perez is duly qualified as an expert on excessive force, his affidavit reflects that he would testify that Officer Sands' decision to tackle Mr. Oates was unreasonable.  (ECF No. 36-3).[13]

In sum, construing the evidence before me in the light most favorable to Plaintiff, the video footage does not clearly contradict Plaintiff's version of the facts.  *See Witts, Tserkis* and *Hupp, supra*.  In sum, analyzing all of the *Graham* factors, genuine disputes of material facts exist regarding whether the amount of force used by Officer Sands was reasonable.  Summary judgment is denied on this claim.

### d. Lethal Force Employed by Officer Sands

Turning to the *Graham* factors for Officer Sands' use of lethal force, the first factor, the severity of the crime at issue, is disputed.  The question is whether Mr. Oates assaulted Officer Sands with a knife.  It is undisputed that Mr. Oates was initially suspected of shoplifting from the Dollar Tree.  However, during the incident involving Officer Sands, a reasonable jury could find that the video depicts that after Officer Sands tackled Mr. Oates, Mr. Oates pulled out a knife, still

---

[13] As previously, this Court does not rely on this affidavit to resolve the Motion.  Instead, I rely on *Scott, Witts, Tserkis,* and *Hupp.*

sheathed, and made one stabbing motion toward Officer Sands.  The footage from Officer Torbeck's Body Worn Camera depicts some of the struggle between Mr. Oates and Officer Sands, and clearly shows Mr. Oates holding a large, dark-colored knife.  However, due to the video quality and the framing of the footage, the video does not clearly capture whether Officer Sands was stabbed.  (Torbeck BWC, 1:13-1:16).  Although the video footage of this altercation offers "some support" for the Defendants' version of events, it does not so clearly support the Defendants' narrative that this Court should disregard a jury could find Plaintiff's version of events more credible.  *Witt*, 633 F.3d at 276 (unreliable quality of video resulted in ambiguity about sequence of events).  Accordingly, construing the facts in the light most favorable to the Estate, Mr. Oates did not harm or stab Officer Sands but merely pulled out a sheathed knife and made one stabbing motion.

In addition, if the Court must also analyze the first *Graham* factor focusing solely on the circumstances surrounding the use of force during the interaction between Mr. Oates and the officers in the Aldi supermarket, i.e., "on the circumstances as they existed at the moment the force was used," then construing the facts in the light most favorable to Plaintiff, the first *Graham* factor may not be relevant. *See Knibbs*, 30 F.4th  at 200 (citing *Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001)).  Alternatively, Mr. Oates did assault Officer Sands, the facts could suggest that the use of force was unreasonable.  *See Wilson*, 893 F.3d at 224.

The analysis of the second and third *Graham* factors "dovetail[]" together, as the issue of whether Mr. Oates posed an immediate threat to officers or others in the Aldi and whether Mr. Oates was resisting arrest rely on the same disputed facts.  *See Tserkis*, 2021 WL 3129325, at *15. Viewing the evidence in the light most favorable to the Estate, a jury could reasonably find the following facts: Officer Sands took Mr. Oates to the ground, after which Mr. Oates pulled out a

27

sheathed knife but did not stab Defendant Sands.  Mr. Oates then walked away unhindered from a group of officers, running into the Aldi Supermarket.  Mr. Oates stood in the supermarket, holding the knife.  Customers were present in the store, but appeared to be far from Mr. Oates, hiding in the back of the store and behind the registers.  Mr. Oates  refused to drop the knife despite officers' commands, and walked slowly toward the officers.  Mr. Oates did not make sudden movements, nor did he threaten the officers.  Mr. Oates kept his knife in his right hand, pointing down at the ground and put his left hand up, palm out, and spoke to the officers in a non-threatening manner, appearing to be praying.  Mr. Oates never pointed the knife at anyone in the Aldi Supermarket, nor at the time when Defendant Sands discharged his weapon. Mr. Oates was attempting to communicate with the officers and de-escalate the situation.[14]  In addition, Mr. Oates' actions could reasonably be understood to demonstrate that he was laboring under some mental or psychological impairment.  Despite this, Defendant Sands stated, "Drop the knife, going to shoot," and then discharged his weapon at Mr. Oates within seconds.

The Court does not find that the video evidence "clearly contradict[s]" the Plaintiff's version of events, such that one can say that Mr. Oates posed an immediate threat to the officers or others, or that  he was knowingly resisting arrest.  *Scott*, 580 U.S. at 378;  *see also Witts, Tserkis,* and *Hupp.*  The events in the Aldi Supermarket take place over a span of approximately thirty-five seconds, all of the video footage is from multiple vantage points, and there are witnesses' statements.  It is up to the jury to decide not only the sequence of events, but also the significance to attach to those events.  A jury could conclude that Mr. Oates did not pose a threat to the officers

---

[14] A witness described Mr. Oates' actions in the Aldi supermarket as "not trying to attack" anyone.  (ECF No. 34-2, p. 123).

or other people and was not resisting arrest, and therefore, Officer Sands' use of lethal force was unreasonable.

On a related note, if such evidence were before it at trial, a jury could find that Officer Sands should have pursued a different alternative to the force that he used. For instance, if after a *Daubert* hearing the Court finds that Captain Perez is duly qualified as an expert on excessive force, his affidavit reflects that he would testify that Officer Sands' actions were not objectively reasonable. (ECF No. 36-3).[15]

In sum, accepting the facts in the light most favorable to the Plaintiff, several genuine disputes of material fact exist as to whether the amount of force used by Officer Sands was reasonable. Summary judgment is denied on this claim.

### e. Lethal Force Employed by Officer Waugh

Analyzing the *Graham* factors for Officer Sands' use of lethal force, a reasonable jury could find that Officer Waugh arrived on the scene as Officer Sands and Mr. Oates were on the ground, then pursued Mr. Oates as he ran down the hill into the Aldi Supermarket. Construing the facts in Plaintiff's favor, Defendant Waugh had no knowledge of any potential stabbing or stabbing motions at the time of shooting. (ECF No. 34-2, p. 107). Accordingly, regarding the first *Graham* factor, Officer Waugh would have only had knowledge about misdemeanor shoplifting and failure to comply with orders as possible crimes at issue, lessening the severity of the suspected crime. Therefore, this factor would weigh against a finding that Defendant Waugh's use of force was reasonable. If the Court must also analyze the first *Graham* factor focusing solely on the circumstances surrounding the use of force during the interaction between Mr. Oates and the

---

[15] As previously, this Court does not rely on this affidavit to resolve the Motion. Instead, I rely on *Scott, Witts, Tserkis,* and *Hupp.*

officers in the Aldi supermarket, then construing the facts in the light most favorable to Plaintiff, the first *Graham* factor does not suggest that the use of force was reasonable.

Regarding the second and third factor, viewing the evidence in the light most favorable to the Estate, a jury could reasonably find that the video depicts the facts as outlined in Section. B.1.d. As with Officer Sands' use of lethal force, a jury could reasonably conclude that Mr. Oates did not pose an immediate threat to those around him and that he was not resisting arrest.

In sum, accepting the facts in the light most favorable to the Plaintiff, several genuine disputes of material fact exist as to whether the amount of force used by Officer Waugh was reasonable. Summary judgment is denied on this claim.[16]

### 2. Qualified Immunity

Defendants Sands and Waugh further assert that the qualified immunity doctrine protects them from suit because they did not violate any clearly established constitutional rights of Mr. Oates.

Qualified immunity is an affirmative defense that shields a police officer from civil liability in a Section 1983 action if "[his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To determine whether an officer is entitled to summary judgment on the basis of qualified immunity, a court must engage in a two-pronged analysis. *Smith*, 781 F.3d at 100 (citing *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (*per curiam*)).  The inquiry under the first prong is whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a

---

[16] As stated above, this Court does not rely on his affidavit in resolving this Motion; instead, I rely on *Scott, Witts, Tserkis,* and *Hupp.*

federal right. *Saucier v. Katz*, 533 U.S. 194, 2021 (2001), *overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that courts may address the two prongs in any order). The second prong of the inquiry examines whether the federal right was clearly established at the time the violation occurred, such that a reasonable person would have known that his conduct was unconstitutional. *Smith*, 781 F.3d at 100 (citing *Ridpath v. Board of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006)). A right is "clearly established" by controlling authority or a consensus of persuasive authority. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted).

As this Court held above in Sections III.B.1.(c), (d), (e), when viewing the evidence in the light most favorable to the Plaintiff, the following uses of force may constitute violations of Mr. Oates's constitutional rights: (a) Officer Sands tackling Mr. Oates; (b) Officer Sands using lethal force; and (c) Officer Waugh using lethal force. Because the two uses of lethal force were deployed at approximately the same time, the Court analyzes them together for the purpose of determining whether clearly established law existed at the time of the incident.

Assuming that Mr. Oates' Fourth Amendment right to be free from an unreasonable seizure was violated, the Court must evaluate whether the right at issue was "clearly established" at the time of the officer's conduct. *Wilson*, 893 F.3d at 219. Granting summary judgment on the basis of qualified immunity is only appropriate if the Defendants "demonstrate 'that there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law.'" *Estate of Jones*, 961 F.3d at 667 (quoting Fed. R. Civ. P. 56(a)); *see also Vathekan v. Prince George's County*, 154 F.3d 173, 179-80 (summary judgment on basis of qualified immunity is "improper as long as there remains any material factual dispute regarding the actual conduct of the defendants."); *Burkhart v. Dickel*, Civ. No. CCB-12-3320, 2014 WL 4388336, at *7 (D. Md. Sept.

4, 2014) (denying summary judgment on qualified immunity, where factual disputes existed bearing on excessive force claims).

### a. Initial Interaction Involving Officer Sands and Mr. Oates

As set forth above, it was clearly established law as of February 19, 2019, the date of the incident, that that tackling a misdemeanor suspect who is passively resisting is a violation of that individual's Fourth Amendment rights. *See Smith*, 781 F.3d at 105; *Rowland*, 41 F.3d at 172-174. Viewing the evidence in the light most favorable to the Plaintiff, Mr. Oates presented a receipt to demonstrate that he purchased all items, did not pose a threat to any officer or bystander, and did not flee. Clearly established law in *Smith* and *Rowland* provided sufficient notice to Officer Sands that tackling Mr. Oates to the ground would violate his Fourth Amendment right to be free from the application of excessive force. If at trial the trier of fact credits Plaintiff's version of event and finds that Officer Sands violated his constitutional rights as previously discussed, Defendant Sands likely will not be given the protection of qualified immunity. Accordingly, Defendant Sands is not entitled to qualified immunity as a matter of law, and summary judgment on these grounds is inappropriate.

### b. Uses of Lethal Force

It was clearly established law as of February 19, 2019, the date of the incident, that in general, a person has the right to be free from deadly force when they are posing no threat. *Cooper*, 735 F.3d at 159. In particular, the Fourth Circuit held in 2018 that an officer violated an individual's Fourth Amendment rights by using lethal force where an individual: (1) was suspected of a violent crime; (2) refuses to comply with commands to drop a knife; (3) walked toward officers; (4) made no sudden movements; and (5) did not threaten anyone. *Wilson*, 893 F.3d at 224. Viewing the video and other evidence in the light most favorable to the Plaintiff, Mr. Oates:

(1) was suspected by Officer Sands of attempting to stab him with a sheathed knife and was suspected by Officer Waugh of a misdemeanor; (2) refused to comply with commands to drop his knife; (3) walked slowly toward officers in the Aldi Supermarket; (4) did not make any sudden movements; and (5) carried his knife in his right hand, pointed down and held his left palm out to de-escalate the situation, not posing an immediate threat to any person.  Clearly established law in *Cooper* and *Wilson* provided sufficient notice to Officers Sands and Waugh that using lethal force would violate Mr. Oates' Fourth Amendment rights.  If, as previously discussed, at trial the jury credits Plaintiff's version of events and finds that Officer Sands and Officer Waugh violated Mr. Oates' constitutional rights, Defendants likely will not be given the protection of qualified immunity. Accordingly, summary judgment on this ground is inappropriate.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Partial Motion to Dismiss/Motion for Summary Judgment is denied.

A separate order will follow.


Dated:  September 22, 2022                    _____/s/_____
                                              The Honorable Gina L. Simms
                                              United States Magistrate Judge